## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DAN GOLUBIEWSKI and STEVEN CHECCHIA, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>ACTIVEHOURS, INC. d/b/a EARNIN,<br><br>    Defendant. | No.<br><br>**CLASS ACTION** |

## CLASS ACTION COMPLAINT

Plaintiffs Dan Golubiewski and Steven Checchia ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this action against Defendant Activehours, Inc. ("Defendant" or "Earnin"), and allege as follows:

## NATURE OF THE ACTION

1.     This case seeks damages, attorneys' fees, and costs against Earnin for its violations of the: Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. §§ 201-1, *et seq.*; Loan Interest and Protection Law ("LIPL"), 41 P.S. §§ 101, *et seq.*; Consumer Discount Company Act ("CDCA"), 7 P.S. §§ 6201, *et seq.*; and Truth-in-Lending Act ("TILA"), 15 U.S.C. §§ 1601, *et seq*.

## JURISDICTION AND VENUE

2.     The Court has subject matter jurisdiction under 28 U.S.C. § 1332(d).

1

3.     The Court has personal jurisdiction over Defendant because the claims at issue arose in this district and Defendant does substantial business in this district.

4.     Venue is proper under 28 U.S.C. § 1391.

## PARTIES

5.     Golubiewski is a person residing in Luzerne County, Pennsylvania.

6.     Checchia is a person residing in Delaware County, Pennsylvania.

7.     Earnin is a technology company headquartered in Palo Alto, California.

8.     Earnin is not a bank and is not licensed under any Pennsylvania statute.

9.     Earnin makes loans or advances to Pennsylvania consumers over the internet.

## FACTUAL ALLEGATIONS

*Earnin's Lending Practices*

10.     Earnin operates a lending app called "Earnin."

11.     The app provides consumers with cash advances in amounts of up to $200.00.

12.     Earnin advertises its cash advances as no-cost, no-fee advances.

13.     This claim is untrue—Earnin's cash advances have significant costs.

14.     Before consumers can obtain advances, they must proceed past a screen that asks for a "tip."

15.     A default "tip" equal to 10% of the cash advance is pre-selected.

16.    Additionally, if a consumer needs an immediate cash advance, Earnin charges a "lightning speed fee" ranging from $1.99 to $3.99.[1]

17.    Earnin's cash advances are repaid in a single installment that is due on a consumer's next pay day, which is two weeks for most consumers.

18.    Earnin's fees and "tips" combine to create costly cash advances that yield APRs in the triple digits.

19.    For example, a $25.00 cash advance with a $2.99 "lightning speed fee" and a two-week repayment schedule yields a 311.81% APR, while a $75.00 cash advance with the same repayment schedule and a $3.99 "lightning speed fee" yields a 138.70% APR.

20.    When "tips" are added, Earnin's APRs increase dramatically.

21.    For example, a $25.00 cash advance with a $2.99 "lightning speed fee," a $2.50 "tip," and a two-week repayment schedule yields a 572.53% APR, while a $75.00 cash advance with a $3.99 "lighting speed fee," a $7.50 "tip," and a two-week repayment schedule yields a 415.37% APR.

22.    Earnin does not disclose the APRs of its cash advances before, during, or after any credit transaction.

---

[1] It costs: $1.99 for an advance of up to $24.99; $2.99 for an advance of $25.00-$74.99; and $3.99 for an advance of $75.00-200.00.

23.     Most (if not all) of Earnin users pay "lighting speed fees" because they need cash advances right away—indeed, consumers use cash advance apps, like Earnin, specifically because they need cash and need it now.

24.     And many users pay "tips" because they do not realize they are being charged a "tip," because they believe "tips" are mandatory, because they cannot figure out how to deselect the default "tip" amount, or because Earnin gives them the false impression that "tips" go back to the Earnin community.

25.     Unlike Uber or DoorDash, Earnin's "tips" do not go to a delivery driver that is trying to make ends meet; Earnin's "tips" provide a profit center for a large company that already is backed by venture capitalists and experienced or institutional investors. *See* Kate Clark, *Earnin raises $125M to help workers track and cash out wages in real time*, TechCrunch (Dec. 20, 2018), https://techcrunch.com/2018/12/20/earnin-raises-125m-to-help-workers-track-and-cash-out-wages-in-real-time/ (noting Earnin raised $190,000,000 in just two rounds of funding); Cyrus Farivar, *Millions use Earnin to get cash before payday. Critics say the app is taking advantage of them*, NBC News (July 26, 2019), https://www.nbcnews.com/tech/internet/millions-use-earnin-get-cash-payday-critics-say-app-taking-n1034071 (stating a celebrity pastor endorsed, and a famous rapper invested in, Earnin).

26.     Earnin discloses to investors that "tips" are a profit center, and that "tips" make up a large part of Earnin's revenue.

27.     But when it comes to consumers, Earnin obscures the truth and hides the fact that "tips" are not going to a human being providing a service, but instead to a highly capitalized company that is using the term "tip" to disguise the true cost of the advances it makes to consumers.

***Earnin's Lending Practices Are Unlawful***

28.     The default interest rate for most loans in Pennsylvania is 6% simple interest per year. 41 P.S. § 201(a).

29.      A non-bank like Earnin can exceed this default rate, and charge interest, fees, and other charges that, in the aggregate, exceed 6% per year, if it obtains a license under the CDCA. 7 P.S. § 6203(A).

30.     If Earnin obtains such a license, it can charge about 24% interest per year, along with other fees and charges. *Id.* §§ 6213, 6217.1.

31.     Earnin, however, is not licensed under the CDCA.

32.     But even if it were, the fees and "tips" Earnin charges far exceed the aggregate amount of interest, fees, and other charges that CDCA licensees are authorized to charge, collect, contract for, or receive.

33.     Earnin may argue that its fees and "tips" do not constitute interest, but whatever term Earnin uses to describe its charges, the fact remains that these charges are made for the use of money and, therefore, are interest.

34.     Pennsylvania courts have long held that attempts to evade Pennsylvania usury laws are unlawful. *Simpson v. Penn Disc. Corp.*, 5 A.2d 796, 798 (Pa. 1939) (citations and quotation marks omitted) ("The statute against usury forms a part of the public policy of the state and cannot be evaded by any circumvention or waived by the debtor[.] It is immaterial in what form or pretence the usurious interest is covered in the contract[.] As usury is generally accompanied by subterfuge and circumvention of one kind or another to present the color of legality, it is the duty of the court to examine the substance of the transaction as well as its form . . . [.] It is, indeed, wholly immaterial under what form or pretence usury is concealed, if it can by any means be discovered our courts will refuse to enforce its payment."); *see, e.g.*, *Walnut Disc. Co. v. Weiss*, 208 A.2d 26, 28 (Pa. Super. 1965) (looking through form of transaction, evaluating its substance, and finding it illegal); *Saunders v. Resnick*, 16 A.2d 676 (Pa. Super. 1940) (same); *Moll v. Lafferty*, 153 A. 557, 558-59 (Pa. 1931) (same); *see also Scott v. Lloyd*, 34 U.S. 418, 446-47 (1835) ("The ingenuity of lenders has devised many contrivances, by which, under forms sanctioned by law, the [usury] statute may be evaded. . . . Yet it is apparent, that if giving this form to the contract will afford a cover which conceals it from judicial investigation, the [usury] statute would become a dead letter. Courts, therefore, perceived the necessity of disregarding the form, and examining into the real nature of the transaction.").

35.    Additionally, that Earnin's "tips" and fees are purportedly voluntary does not mean they are not usurious, as "[t]he payment of usurious interest is usually voluntary." *Marr v. Marr*, 20 A. 592, 593 (Pa. 1885); *see also Stock v. Meek*, 221 P.2d 15, 20 (Cal. 1950) ("The theory of [a usury] law is that society benefits by the prohibition of loans at excessive interest rates, even though both parties are willing to negotiate them. Accordingly, 'voluntary' payments of interest do not waive the rights of the payors.").

36.    The Pennsylvania legislature passed usury laws specifically to prevent the types of schemes at issue here. *Smith v. Mitchell*, 616 A.2d 17, 20 (1992) (stating purpose of usury laws is "to protect the citizenry of this Commonwealth from being exploited at the hands of unscrupulous individuals seeking to circumvent the law at the expense of unsuspecting borrowers who may have no other avenue to secure financial backing.") (emphasis in original).

37.    But even if Earnin's fees and "tips" are not interest, the CDCA prohibits charging, collecting, contracting for, or receiving interest, fees, or any other charges that, in the aggregate, exceed 6% simple interest per year. 7 P.S. § 6203(A).

38.    This limitation applies to any type of cost imposed by a covered entity, regardless of whether the cost is interest or is charged on the amount actually loaned or advanced. *Pa. Dep't of Banking v. NCAS of Del., LLC*, 948 A.2d 752, 760-62 (Pa. 2008) (applying CDCA aggregate limit to a monthly participation fee).

39.    By engaging in the business of negotiating or making loans or advances, and by charging, collecting, contracting for, and receiving fees and "tips" that, in the aggregate, exceed 6%, Earnin is charging, collecting, contracting for, and receiving amounts it cannot lawfully charge, collect, contract for, or receive. 7 P.S. § 6203(A).

***Earnin's Lending Practices Harm Pennsylvania Consumers***

40.    The advances that Earnin makes to Pennsylvania residents are merely payday loans that have been repackaged in a user-friendly app and deceptively rebranded as no-cost, no-fee cash advances.

41.    The myriad harms caused by payday loans are well documented.

42.    Payday loans are a type of "balloon" loan, which means the principal and any fee, interest, or other charge are paid in a single amount at a specified time.

43.    Most payday loans are due to be repaid on a consumer's next payday, which is typically two weeks or less from when the loan is obtained.

44.    Earnin's advances similarly require payment on the next payday and require full payment of the principal and any fees or "tips."

45.    Payday loans, like Earnin's advances, can become debt traps that lead to a cycle of dependency and reborrowing.

46.    Traditional payday loans, like Earnin's advances, have triple digit APRs and are the most expensive form of credit.

47.     Due to the cost of these loans, consumers generally are unable to pay them back on time and are forced to take out another loan from the same or a different payday lender.

48.     Unlike traditional payday lenders, which disclose the cost of their loans in terms of APR before a consumer obtains credit, Earnin does not disclose the cost of its advances in terms of APR before, during, or after a consumer obtains credit.

49.     Because of this, most borrowers are wholly unaware that they are agreeing to obtain credit at triple digit APRs, or that there are far cheaper forms of credit available. *See, e.g.,* Cyrus Farivar, *Millions use Earnin to get cash before payday. Critics say the app is taking advantage of them*, NBC News (July 26, 2019), https://www.nbcnews.com/tech/internet/millions-use-earnin-get-cash-payday-critics-say-app-taking-n1034071 (detailing story of Earnin user who had no idea her loan or advance had a triple digit APR).

50.     Simply put, Earnin's business takes advantage of consumers' lack of awareness of how Earnin's fees and "tips" add up to make Earnin's advances difficult to repay and more costly than other forms of credit.

51.     As one Earnin user explained:

Earnin didn't charge Raines a fee, but asked that he "tip" a few dollars on each loan, with no penalty if he chose not to. It seemed simple. But nine months later, what was originally a stopgap measure has become a crutch.

"You borrow $100, tip $9, and repeat," Raines, a highway-maintenance worker in Missouri, told me. "Well, then you do that for a bit and they raise the limit, which you probably borrow, and now you are in a cycle of get paid and borrow, get paid and borrow." Raines said he now borrows about $400 each pay cycle.

Sidney Fussell, *The New Payday Lender Looks a Lot Like the Old Payday Lender*, The Atlantic (Dec. 18, 2019), https://www.theatlantic.com/technology/archive/2019/12/online-banking-lending-earnin-tip/603304/.

52.    Because payday loans, like Earnin's advances, can trap consumers in cycles of debt, the Pennsylvania legislature made this form of credit illegal in 1937 by passing the CDCA, which, at most, allows for APRs ranging from approximately 24% to 29% (depending on the term and size of a loan and the fees a lender charges) for licensed lenders, 7 P.S. §§ 6213, 6217.1, and limits APRs to no more than 6% for unlicensed lenders, *id.* § 6203(A); 41 P.S. § 201(a).

53.    By charging fees and "tips" that yield triple digit APRs, Earnin is trapping many Pennsylvania residents in a detrimental cycle of debt, making them dependent on Earnin and other lenders to make ends meet.

54.    The high cost of Earnin's advances takes money that residents of the Commonwealth need to pay for basic necessities, including food, rent, utilities, and other expenses.

***Facts Relevant to Golubiewski***

55.     Golubiewski has obtained various cash advances from Earnin.

56.     Golubiewski used each advance for personal, family, and/or household purposes.

57.     In doing so, Golubiewski paid Earnin's "tip" and "lightning speed fee."

58.     Each time Golubiewski paid a "tip" or "lighting speed fee," the charges paid, in the aggregate, exceeded 6%.

59.     For example, on June 20, 2020, Golubiewski obtained a $100.00 cash advances.

60.     In doing so, he paid a $6.00 "tip" and $3.99 "lightning speed fee."

61.     The cash advance was to be repaid in two weeks, yielding an APR of 260.45%.

62.     Earnin did not disclose the cost of this advance or any other advances Golubiewski obtained through the Earnin app.

63.     Golubiewski was unaware of the cost of Earnin's cash advances.

64.     Golubiewski has stopped using the Earnin app.

65.     Golubiewski seeks to obtain, on behalf of himself and the class, $100 for each cash advance obtained, three times the amount of "tips," fees, and other charges on each cash advance, and all of the other relief detailed below.

### *Facts Relevant to Checchia*

66.     Checchia has obtained various cash advances from Earnin.

67.     Checchia used each advance for personal, family, and/or household purposes.

68.     In doing so, Checchia paid Earnin's "tip" and "lightning speed fee."

69.     Each time Checchia paid a "tip" or "lighting speed fee," the charges paid, in the aggregate, exceeded 6%.

70.     For example, on September 11, 2022, Checchia obtained a $100.00 cash advances.

71.     In doing so, he paid a $3.99 "tip" and $3.99 "lightning speed fee."

72.     The cash advance was to be repaid in two weeks, yielding an APR of 208.31%.

73.     Earnin did not disclose the cost of this advance or any other advances Checchia obtained through the Earnin app.

74.     Checchia was unaware of the cost of Earnin's cash advances,

75.     Checchia has stopped using the Earnin app.

76.     Checcia seeks to obtain, on behalf of himself and the class, $100 for each cash advance obtained, three times the amount of "tips," fees, and other charges on each cash advance, and all of the other relief detailed below.

## CLASS ACTION ALLEGATIONS

77.    Plaintiffs bring this action individually and on behalf of all others similarly situated under Rule 23 of the Federal Rules of Civil Procedure.

78.    Plaintiffs seek to certify the following class: "All persons who obtained an advance or loan from Defendant with a Pennsylvania address and paid a 'lightning speed fee,' 'tip,' or any other interest, fee, charge, or cost."

79.    Plaintiffs reserve the right to expand, narrow, or otherwise modify the class as the litigation continues and discovery proceeds.

80.    Fed. R. Civ. P. 23(a)(1): The class is so numerous that joinder is impracticable. There are thousands of members of the class. The class is identifiable by the records of Defendant and Plaintiffs and the class members.

81.    Fed. R. Civ. P. 23(a)(2), (b)(3): Plaintiffs and the class members share numerous common questions of law and fact that will drive the resolution of the litigation and predominate over individual issues. For example, there is a single common answer to whether Defendant can charge, collect, contract for, and receive interest and fees that aggregate in excess of the rates and amounts set forth in the LIPL or CDCA. This question, and other common questions, predominate over any individual issues.

82.     <u>Fed. R. Civ. P. 23(a)(3):</u> Plaintiffs' claims are typical of the claims of the members of the class because the claims of Plaintiffs and the class are based on the same legal theories and arise from the same conduct.

83.     <u>Fed. R. Civ. P. 23(a)(4):</u> Plaintiffs are adequate representatives of the class because the interests of Plaintiffs and the class align. Plaintiffs will fairly, adequately, and vigorously represent and protect the interests of the class and have no interest antagonistic to the class. Plaintiffs retained counsel who are competent and experienced in the prosecution of class action litigation generally and consumer finance litigation specifically.

84.     <u>Fed. R. Civ. P. 23(b)(3):</u> Given the complexity and nature of the issues presented and the relief requested, the expense and time necessary to obtain such relief, and the anticipated recovery and relief Plaintiffs and the class members may obtain, the class action mechanism is by far the preferred and most efficient litigation mechanism to adjudicate the claims of Plaintiffs and the class. Additionally, requiring Plaintiffs and the class members to file individual actions would impose a crushing burden on the court system and almost certainly lead to inconsistent judgments. Class treatment presents far fewer management difficulties and provides benefits of a single adjudication and economies of scale.

<u>**COUNT I**</u>
**Violation of the Unfair Trade Practices and Consumer Protection Law**
**73 P.S. §§ 201-1, *et seq.***

85.    This claim is brought individually and on behalf of the class.

86.    Plaintiffs, the class members, and Defendant are persons, the advances at issue were used to buy goods or services for personal, family, and/or household use, and Defendant's conduct is trade or commerce under the UTPCPL. 73 P.S. §§ 201-2(2)-(3), 201-9.2.

87.    The conduct at issue in this case constitutes unfair methods of competition or unfair or deceptive acts or practices under the UTPCPL because Defendant: caused a likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods and services; caused a likelihood of confusion or misunderstanding as to affiliation, connection or association with, or certification by, another; represented that goods or services had sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they did not have; and engaged in fraudulent or deceptive conduct which created a likelihood of confusion or misunderstanding. *Id.* §§ 201-2(4)(ii), 201-2(4)(iii), 201-2(4)(v), 201-2(4)(xxi).

88.    More specifically, Defendant's conduct is unfair or deceptive because, among other things, Defendant's "tips" and fees are sham interest, Defendant's advances are offered at an excessive rate of interest and fees, Defendant's advances

have high costs, despite Defendant's claim that it makes no-cost, no-fee advances, Defendant is not a lawful lender offering lawful advances, despite Defendant's implications to the contrary, and Defendant cannot charge, collect, contract for, or receive the "tips" and fees it charges, despite Defendant's implication to the contrary. *Pa. Dep't of Banking v. NCAS of Del., LLC*, 995 A.2d 422, 442-44 (Pa. Cmwlth. 2010) (finding claim for relief stated under the UTPCPL where complaint alleged that a payday lender "offer[ed] a line of credit product . . . at an excessive rate of interest").

89.    Defendant's use of unfair methods of competition or unfair or deceptive acts or practices in the conduct of trade or commerce violates 73 P.S. § 201-3.

90.    Plaintiffs and the class members lost money or property as a result of Defendant's violations and therefore are entitled to actual damages, statutory damages, treble damages, and all other available relief under 73 P.S. § 201-9.2, as well as reasonable costs and attorneys' fees, and such additional relief the Court deems necessary or proper.

## COUNT II
### Violation of the Loan Interest and Protection Law
### 41 P.S. §§ 101, *et seq.*

91.     This claim is brought individually and on behalf of the class.

92.     Plaintiffs and the class members are persons who paid a rate of interest in excess of that provided for by the LIPL and CDCA, and who paid charges prohibited or in excess of those allowed by the LIPL and CDCA.

93.     Defendant collected from Plaintiffs and the class members interest in excess of that provided for by the LIPL and CDCA, and charges prohibited or in excess of those allowed by the LIPL and CDCA.

94.     The LIPL provides for, among other things, damages, declaratory and injunctive relief, and attorneys' fees and costs. 41 P.S. §§ 501, 502, 503.

95.     Accordingly, the Court should issue an order: awarding any excess interest, fees, or other charges collected by Defendant; awarding triple the amount of any excess interest, fees, or other charges collected by Defendant; awarding attorneys' fees and costs; and awarding all other relief that is necessary and proper.

## COUNT III
## Violation of the Consumer Discount Company Act
### 7 P.S. §§ 6201, *et seq.*

96.     This claim is brought individually and on behalf of the class.

97.     Defendant is in the business of negotiating, making, or arranging loans or advances, is not a bank, and is not licensed under the CDCA or any other Pennsylvania statute.

98.     Consequently, Defendant could not charge, collect, contract for, or receive more than 6% combined interest, fees, or other charges on loans or advances issued in amounts under $25,000. 7 P.S. § 6203; 41 P.S. § 201(a).

99.     Defendant, however, charged, collected, contracted for, or received interest, fees, or other charges above this amount.

100.    Equitable relief is available to private parties under the CDCA. *Mellish v. CACH, LLC*, No. 19-cv-01217, 2020 U.S. Dist. LEXIS 52383, at *7 (W.D. Pa. Mar. 26, 2020) ("If a private civil litigant seeks enforcement of the CDCA, the available remedy is equitable[.]").

101.    Accordingly, the Court should issue an order: awarding restitution in the amount of any interest, fees, or other charges that Defendant charged, collected, contracted for, or received in excess of 6%; awarding attorneys' fees and costs; and awarding all other relief that is necessary and proper.

## COUNT IV
### Violation of the Truth-In-Lending Act
### 15 U.S.C. §§ 1601, *et seq.*

102.   This claim is brought individually and on behalf of the class.

103.   Defendant is a "creditor," Plaintiffs' and the class members' cash advances are "consumer credit transactions," and Plaintiffs, Defendant, and the class members are "persons" within the meaning of TILA. 15 U.S.C. §§ 1602(e), (f), (g), (i).

104.   TILA required Defendant to disclose the: "amount financed"; "finance charge"; "annual percentage rate"; and "total of payments." *Id.* §§ 1638(a)(2), (3), (4), (5).

105.   The purpose of these disclosure requirements is to ensure a meaningful disclosure of credit terms to protect consumers against unfair credit practices and to ensure consumers avoid the uninformed use of credit. *Id.* § 1601(a).

106.   Defendant failed to disclose, among other things, the "amount financed," "finance charge," "annual percentage rate," "total of payments," and payment schedule to Plaintiffs and the class members.

107.   Indeed, at no time before, during, or after Plaintiffs or any class member obtained a loan or advance did Defendant disclose any of the above terms.

108.   Because Defendant failed to comply with various requirements imposed by TILA, Defendant is liable to Plaintiffs and the class members in an

amount equal to actual damages, statutory damages, costs, reasonable attorneys' fees, and all other available relief. *Id.* § 1640(a).

## JURY TRIAL DEMANDED

Plaintiffs requests a jury trial on all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

a.   An order certifying the proposed class, appointing Plaintiffs as representatives of the proposed class, and appointing undersigned counsel as counsel for the proposed class;

b.   An order awarding actual, statutory, treble, and all other damages available by law, along with pre- and post-judgment interest;

c.   An order providing Plaintiffs and the class members restitution for any interest, fees, or other charges that were paid to Defendant and that aggregated in excess of 6%;

d.   An order awarding attorneys' fees and costs;

e.   An order declaring Defendant's conduct unlawful; and

f.   An order awarding all other relief that is just, equitable, and appropriate.

Respectfully Submitted,

Dated: December 30, 2022    By:   */s/ Kevin Abramowicz*
    Kevin Abramowicz
    Kevin Tucker
    Chandler Steiger
    Stephanie Moore
    **East End Trial Group LLC**
    6901 Lynn Way, Suite 215
    Pittsburgh, PA 15208
    Tel: (412) 223-5740
    Fax: (412) 626-7101
    kabramowicz@eastendtrialgroup.com
    ktucker@eastendtrialgroup.com
    csteiger@eastendtrialgroup.com
    smoore@eastendtrialgroup.com

    *Attorneys for Plaintiffs*