UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DAN GOLUBIEWSKI et al., <br><br> Plaintiffs, <br><br> v. <br><br> ACTIVEHOURS, INC., et al., <br><br> Defendants. | CIVIL ACTION NO. 3:22-CV-02078 <br><br> (MEHALCHICK, J.) |

**MEMORANDUM**

Plaintiffs Dan Golubiewski and Steven Checchia (collectively, "Plaintiffs") individually and on behalf of a putative class, initiated this action against Defendant Activehours, Inc. d/b/a/ EarnIn ("EarnIn") by filing a complaint asserting violations of the Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), the Loan Interest and Protection Law ("LIPL"), the Consumer Discount Company Act ("CDCA"), and the Truth-in-Lending Act ("TILA"). (Doc. 1; Doc. 18). Plaintiffs filed the operative second amended complaint on October 7, 2024. (Doc. 48). Presently before the Court is EarnIn's motion to dismiss Plaintiffs' second amended complaint. (Doc. 49). For the foregoing reasons, EarnIn's motion to dismiss is **DENIED**. (Doc. 49).

I. **BACKGROUND AND PROCEDURAL HISTORY**

The following background is taken from the second amended complaint. (Doc. 48). EarnIn is an app that enables users to get cash advances of up to $100 per use from their own paychecks. (Doc. 48, ¶¶ 3, 19-20). "The advertised and intended purpose of EarnIn's cash advance product is to provide an instant source of money directly from a cell phone, that consumers can use to pay time-sensitive obligations or cover surprise expenses." (Doc. 48, ¶ 21). EarnIn is not a bank and is not a licensed lender under any Pennsylvania statute. (Doc. 48, ¶ 17). However:

> To ensure it gets paid, EarnIn requires its users to: (i) have an employer that pays them regularly; (ii) link the bank account to which paychecks are deposited to EarnIn's app; and (iii) authorize EarnIn to automatically debit linked accounts on payday in an amount that is equal to the advance a user receives and the tips and fees a user agrees to repay.

(Doc. 48, ¶ 42).

On the EarnIn app, users can either receive a "standard" or "expedited" advance. (Doc. 18, ¶ 32). The standard advance appears in the user's bank account within a few days, while the expedited advance arrives within minutes. (Doc. 18, ¶ 33). To obtain an "expedited advance," users must pay a "lightning speed fee," which ranges from $1.99 to $3.99. (Doc. 18, ¶ 34). Before users can obtain a standard or an expedited advance, EarnIn also requests payment of a "tip." (Doc. 48, ¶¶ 29-33). In collecting these tips, EarnIn uses "deceptive tactic[s]" to fool users into thinking the tip is mandatory. (Doc. 48, ¶¶ 29-33). For example, none of the default options include not paying a tip, and if a consumer does not wish to pay a tip, the consumer must proactively change the default amount to $0.00. (Doc. 48, ¶¶ 35-37). Then "[w]hen a consumer changes the default tip to $0, they are taken back to the original tip screen, and are asked to confirm that they wish to forgo paying a tip and forgo helping to 'support EarnIn.'" (Doc. 48, ¶ 37). These tips and are a major source of revenue for EarnIn. (Doc. 48, ¶ 31). Furthermore, "[t]he average fees and tips that EarnIn collects on its advances yield an APR-equivalent of 284%." (Doc. 48, ¶ 39). These charges are not disclosed per the requirements of the relevant lending statutes. (Doc. 48, ¶¶ 77-79).

Plaintiffs' second amended complaint contains two counts; one for violation of 41 P.S. § 502, Pennsylvania's Usury Statutes and the other for violation of 15 U.S.C. §§ 1601, et seq., the Truth-In-Lending Act. (Doc. 48, at 19-22). On October 21, 2024, EarnIn filed a motion to dismiss the second amended complaint and a brief in support its motion. (Doc. 49; Doc. 50). On November 4, 2024, EarnIn filed a brief in opposition to the motion. (Doc. 53). On

November 18, 2024, EarnIn filed a reply brief.[1] (Doc. 54). Accordingly, the motion to dismiss is ripe and ready for disposition.

## II.     MOTION TO DISMISS STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes a defendant to move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To assess the sufficiency of a complaint on a Rule 12(b)(6) motion, a court must first take note of the elements a plaintiff must plead to state a claim, then identify mere conclusions that are not entitled to the assumption of truth, and finally determine whether the complaint's factual allegations, taken as true, could plausibly satisfy the elements of the legal claim. *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011). In deciding a Rule 12(b)(6) motion, the court may consider the facts alleged on the face of the complaint, as well as "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

After recognizing the required elements that make up the legal claim, a court should "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The plaintiff must provide some factual ground for relief, which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Thus, courts "need not credit a complaint's 'bald assertions' or 'legal conclusions'. . . " *Morse v.*

---

[1] On May 1, 2025 and August 11, 2025, EarnIn also filed notices of supplemental authority. (Doc. 55; Doc. 56).

3

*Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429-30 (3d Cir. 1997)). Nor need a court assume that a plaintiff can prove facts that the plaintiff has not alleged. *Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

A court must then determine whether the well-pleaded factual allegations give rise to a plausible claim for relief. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Palakovic v. Wetzel*, 854 F.3d 209, 219-20 (3d Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678) (internal quotation marks omitted); *see also Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 262 n.27 (3d Cir. 2010). The court must accept as true all allegations in the complaint, and any reasonable inferences that can be drawn therefrom are to be construed in the light most favorable to the plaintiff. *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir. 1994). This "presumption of truth attaches only to those allegations for which there is sufficient factual matter to render them plausible on their face." *Schuchardt v. President of the U.S.*, 839 F.3d 336, 347 (3d Cir. 2016) (internal quotation and citation omitted). The plausibility determination is context-specific and does not impose a heightened pleading requirement. *Schuchardt*, 839 F.3d at 347.

### III. DISCUSSION

This Court previously dismissed Plaintiffs' complaint and their first amended complaint. (Doc. 1; Doc. 18; Doc. 44; Doc. 45). Now, according to EarnIn, with their second amended complaint, "Plaintiffs have accepted a third chance at alleging a claim but have done nothing different with it except to change some labels and re- phrase previous allegations that the Court found to be insufficient." (Doc. 50, at 4). EarnIn continues:

4

> While Plaintiffs have narrowed their case to two claims under the Pennsylvania Usury Statutes and the Truth-in-Lending Act and changed words or screenshots here and there, there is no substantive change to Plaintiffs' allegations that shows what the Court said was required: that the voluntary tips and Lightning Fees were compulsory or a "necessary condition" to obtaining the advance.

(Doc. 50, at 4).

Plaintiffs respond that developments in the interpretation of Pennsylvania usury law support their position that this case presents "yet another usury-evasion scheme." (Doc. 53, at 6). Plaintiffs explain their theory of the case as follows:

> [EarnIn] makes short-term, high-cost loans to Pennsylvanians through a cellphone app called "Earnin." And [EarnIn] collects charges on its loans as part of an automatic payment taken from the borrower's bank account a few days later. Defendant insists that these charges are not the legal equivalent of "interest," but rather come from supposedly voluntary "lightning speed" fees and "tips" paid by its customers. Yet for those who choose to pay those charges and have [EarnIn] debit those charges from their bank accounts on payday, Pennsylvania law is clear: any charge—no matter how labeled—that is collected on a cash advance is treated as "interest."

(Doc. 53, at 6).

In response to EarnIn's conclusion that the second amended complaint "does nothing different," Plaintiff aver "[t]he [second amended complaint] sets forth more than enough new facts to establish that Pennsylvania usury law and TILA have been violated here. And, in the year since the last operative complaint was filed, various agency actions have been taken that support those new allegations." (Doc. 53, at 8). Thus, Plaintiffs maintain that it "[i]t is plausible that the Defendants are violating Pennsylvania usury law and TILA." (Doc. 53, at 8). The Court will address each claim in turn.

    A.    <u>PENNSYLVANIA USURY STATUTES</u>

In Count I of their second amended complaint, Plaintiffs seek to recover allegedly usurious charges collected by EarnIn's violation of 41 P.S. § 502, Pennsylvania's Usury

Statute. (Doc. 48, ¶¶ 66-73; Doc. 53, at 12). In arguing that this count should be dismissed, EarnIn submits "[i]t is unclear whether Plaintiffs are combining their claims under the Consumer Discount Company Act and Loan Interest Protection Law or asserting one or the other. Regardless, they fail." (Doc, 50, at 8-9). In their opposition brief, Plaintiffs explain"

> In the earlier complaint that this Court dismissed, Plaintiffs alleged separate claims under the [Loan Interest and Protection Law] and the [Consumer Discount Company Act]. Plaintiffs have revised that formulation in the [second amended complaint], pleading a unitary claim under Pennsylvania usury law, with the [Consumer Discount Company Act] providing the substantive law, and the [Loan Interest and Protection Law] providing the remedy.

(Doc. 53, at 16 n.5). Plaintiffs further explain that Count I of their second amended complaint must survive because "[t]he relevant part of the [[Consumer Discount Company Act] prohibits 'charg[ing],' 'collect[ing]' or 'receiv[ing]' more than the 6% interest cap[,]" and they have alleged "Defendant violated that prohibition here because Defendant 'collected' and 'received' tips and fees that, both individually and in the aggregate, exceeded the relevant 6% cap." (Doc. 53, at 17) (citing Doc. 49, ¶¶ 38-39; 7 P.S. § 6203A).

"It is well established that Commonwealth public policy prohibits usurious lending, a prohibition that has been recognized for well over 100 years." *Pennsylvania Dep't of Banking v. NCAS of Delaware, LLC*, 948 A.2d 752, 758 (Pa. 2008) (citing *Earnest v. Hoskins*, 100 Pa. 551, 559 (1882); *Richman v. Watkins*, 376 Pa. 510, 515, 103 A.2d 688, 691 (1954); *Gilbert v. Otterson*, 379 Pa. Super. 481, 486, 550 A.2d 550, 553 (1988)). In Pennsylvania, two statutes, the Loan Interest and Protection Law ("LIPL") 41 Pa. Stat. §§ 101-605, and the Consumer Discount Company Act ("CDCA") 7 Pa. Stat. §§ 6201-6221, govern lending activity. When the Pennsylvania legislature enacted the lending statutes, it did so to protect "borrowers 'against extortionate interest charges' for 'loans of comparatively small amounts.'" *Petro v. Lundquist Consulting Inc.*, No. 22-3051, 2024 WL 467542, at *1 (3d Cir. Feb. 7, 2024) (citing *Cash Am.*

6

*Net of Nev., LLC v. Dep't of Banking*, 978 A.2d 1028, 1036 (Pa. Commw. Ct. 2009)). The LIPL sets a maximum interest rate of 6% for most loans below $50,000. 41 Pa. Stat. § 201. Meanwhile, the CDCA sets a limit of 6% for a broader range of charges beyond interest. 7 Pa. Stat. § 6203(A). The CDCA provides that "no person shall ... make [ ] loans or advance[ ] money on credit, in the amount or value of ... [ ]$25,000[ ] or less, and charge, collect, contract for or receive interest ... which aggregate in excess of the interest that the lender would otherwise be permitted by law to charge." 7 Pa. Stat. § 6203(A) .

Pennsylvania courts have explained that while the LIPL and CDCA are closely related, the CDCA applies more broadly than the LIPL. *See NCAS*, 948 A.2d at 758-59. In *Pennsylvania Department of Banking v. NCAS of Delaware, LLC*, the Pennsylvania Supreme Court explained that "[t]he CDCA, [], regulates costs associated with a loan more broadly than does the LIPL." 948 A.2d at 758-59. While the LIPL sets 'the maximum lawful rate of interest' that may be charged in Pennsylvania[,]" the CDCA "caps not only 'interest' but also the amount of 'discount, bonus, fees, fines, commissions, charges, or other considerations.'" *NCAS*, 948 A.2d at 758. Furthermore, the CDCA accounts for any form of "advances of money on credit," and treats any "fees" or "charges," however labeled as "interest." *NCAS*, 948 A.2d at 760.

Relevant here and as submitted by Plaintiffs, the Attorney General is charged with enforcing Pennsylvania's usury law. 41 P.S. § 506(a). On October 7, 2024, in an Assurance of Voluntary Compliance ("AVC") issued against Respondent SoLo Funds Inc., Pennsylvania's Attorney General explained "the interest rate caps under the LIPL and CDCA apply to all credit-related charges, whether they are labeled interest or not. In interpreting the CDCA, the Pennsylvania Supreme Court has concluded that the statute 'prohibits unlicensed lenders of under $25,000 from charging interest and any type of other or additional charge or charges that aggregate in excess of six percent.'" (Doc. 48-4, at 5). As explained by Plaintiffs,

7

"[a]mong other things, the AVC enjoined SoLo to modify its platform 'to prevent Pennsylvania Lenders from funding any loan request where the combined tip and donation exceed the interest rates permitted under Pennsylvania's LIPL and CDCA.'" (Doc. 53, at 21). Thus, Plaintiffs suggest that "for purposes of interpreting Pennsylvania law, this Court is no longer writing on a blank slate," as the Attorney General has now taken a stance on the LIPL and CDCA's application to facts similar to those again at bar. (Doc. 53, at 21).

With respect to remedies, "[w]hen a debtor is made to pay interest exceeding this maximum rate, the LIPL authorizes the debtor to sue and recover treble damages" under Pennsylvania Usury statute. *Williams v. Encore Cap. Grp., Inc.*, 602 F. Supp. 3d 742, 745 (E.D. Pa. 2022) (citing 41 P.S. § 502). 41 P.S. § 502 states:

> A person who has paid a rate of interest for the loan or use of money at a rate in excess of that provided for by this act or otherwise by law or has paid charges prohibited or in excess of those allowed by this act or otherwise by law may recover triple the amount of such excess interest or charges in a suit at law against the person who has collected such excess interest or charges: Provided, That no action to recover such excess shall be sustained in any court of this Commonwealth unless the same shall have been commenced within four years from and after the time of such payment. Recovery of triple the amount of such excess interest or charges, but not the actual amount of such excess interest or charges, shall be limited to a four-year period of the contract.

With this law considered, the Court will deny EarnIn's motion to dismiss and allow Count I of the second amended complaint to proceed.

As a primary matter, the Court agrees with Plaintiffs that under Pennsylvania Usury law, there is no "necessary condition" test that requires a charge to be "inextricably related" as a "necessary condition" to obtaining a cash advance to be a covered by the CDCA. (Doc. 53, at 18). Instead, as articulated by Plaintiffs, this Court understands the CDCA's plain language to "make clear that charges need not be a 'necessary condition' for every possible use of an app for transactions to be subject to the usury cap where a user pays those charges."

(Doc. 53, at 20). In their second amended complaint, Plaintiffs allege:

> The lightning speed fees and tips that Defendant collects from the automatic debits it has taken from the bank accounts of Plaintiffs and members of the Class are "fees, charges, or other considerations which aggregate in excess of the interest that the lender would otherwise be permitted by law to charge if not licensed under [the CDCA] on the amount actually loaned or advanced." 7 P.S. § 6203A

(Doc. 49, ¶ 70).

The CDCA clearly prohibits unlicensed covered entities from "charg[ing], collect[ing], contract[ing] for or receiv[ing] interest." 7 P.S. § 6203. As explained by Plaintiffs, they allege that when "a supposedly 'voluntary' tip or expedited delivery fee is being 'charged' by [EarnIn], those amounts are certainly 'collected' and 'received' [by EarnIn] from [EarnIn users] who chose an 'instant' cash advance. . . when [EarnIn] enforces its automatic debit rights to take those charges from a user's bank account on payday." (Doc. 53, at 20). Plaintiffs allege that EarnIn further collects charges from those "who fail to be savvy enough to avoid paying a tip." (Doc. 53, at 20). Because, despite how they are labeled, the CDCA treats these "charges" as interest, and because in the aggregate Plaintiffs allege this collection exceeds the LIPL's 6% limit, Plaintiffs' claim brought under Pennsylvania's Usury law must survive. *See NCAS*, 948 A.2d at 760. Indeed, this conclusion is supported by the statutory language of the CDCA and LIPL and mirrors recent guidance from the Pennsylvania Attorney General's Office. Further, because Plaintiffs allege EarnIn charges interests as defined by the CDCA beyond the 6% limit, Plaintiffs may "sue and recover treble damages" under the LIPL and 41 P.S. § 502. *Williams*, 602 F. Supp. 3d at 745. EarnIn's motion to dismiss Count I of the second amended complaint will therefore be **DENIED**. (Doc. 48, ¶¶ 66-73; Doc. 49).

    B.    TRUTH-IN-LENDING ACT

In Count II of their second amended complaint, Plaintiffs allege that EarnIn violated

TILA, 15 U.S.C. §§ 1601, *et seq*. (Doc. 48, ¶¶ 74-79). According to EarnIn, "[t]his Court previously dismissed Plaintiffs' claims under the TILA, and Plaintiffs have presented no new material facts to overcome their previous deficiencies." (Doc. 48, at 10). EarnIn continues, "Plaintiffs continue to press the same case as they have from the beginning: they want the Court to consider voluntary tips and fees to involuntary even though Plaintiffs' advance history shows that they were not: Plaintiffs agree they sought and received advances with and without paying tips or fees." (Doc. 50, at 11). EarnIn urges this Court to apply its previous interpretation of TILA and its demands here because "there are no additional facts that plausibly allege the tips and Lightning Speed fees to be 'a condition to credit[.]'" (Doc. 50, at 11). Plaintiffs maintain that they have plausibly alleged that EarninIn is violating TILA by not disclosing "tips" and the "lightening speed" fees it collects as finance charges. (Doc. 53, at 25).

As articulated by Plaintiffs, "[w]hile Pennsylvania usury law directly regulates the amount of charges that cash-advance businesses can collect, TILA regulates information about the price tag that must be disclosed beforehand. *See* 15 U.S.C. § 1638." (Doc. 53, at 25). TILA regulates "the relationship between lenders and consumers. . . by requiring certain disclosures regarding loan terms and arrangements." *McCutcheon v. America's Servicing Co.*, 560 F.3d 143, 147 (3d Cir. 2009). "TILA generally requires that a creditor in a consumer transaction disclose, among other things: (1) the identity of the creditor; (2) the amount financed; (3) the finance charge; (4) the annual percentage rate; (5) the sum of the amount financed and the finance charge, or total of payments; [and] (6) the number, amount, and due dates or period of payments scheduled." *Krieger v. Bank of Am., N.A.*, 890 F.3d 429, 432 (3d Cir. 2018) (quote omitted). Creditors also must disclose definitions and explanations of those terms and information about borrower's rights in a manner that is reasonably understandable

and noticeable to the consumer. *See Krieger*, 890 F.3d at 432-33. A consumer may file suit under TILA against a creditor that fails to comply with the relevant requirements. *See* 15 U.S.C. § 1640(e). Throughout this litigation, EarnIn has maintained it does not extend consumer credit subject to a finance charge in violation of TILA. (Doc. 50, at 10-13); *see Krieger*, 890 F.3d at 432-33. Thus, the question the Court must resolve is whether the "tips" and "lightning speed" fees charged by EarnIn are properly categorized as finances charges that must be disclosed under TILA and whether EarnIn's failure to disclose them gives rise to a claim under the TILA. *See Krieger*, 890 F.3d at 432-33.

Congress has defined "finance charge" under TILA as "all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit." 15 U.S.C. § 1605(a); *see Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 239 (2004). As related to the extension of credit, the phrase "incident to" requires that there is some necessary connection between the credit and the charge. *See Pfennig*, 541 U.S. at 239-41 ("this Court has recognized that the phrase 'incident to or in conjunction with' implies some necessary connection between the antecedent and its object") (citing *Holly Farms Corp. v. NLRB,* 517 U.S. 392, 403, n. 9 (1996)). There is some ambiguity about the degree of relatedness required between the charge and the credit for the charge to be classified as a "finance charge." *See Pfennig*, 541 U.S. at 241 (reversing a case-by-case approach to determining whether certain overcharge fees are finance charges in favor of a unilateral exclusion of overcharge fees from the finance charge definition and stating "the phrase 'incident to' does not make clear whether a substantial (as opposed to a remote) connection is required.").

Here, EarnIn requests that this Court apply its previous finding that "the tips and fees are not a condition to credit" when considering whether they are properly considered to be a

finance charge. (Doc. 50, at 10-13). However, a deeper review of the law, particularly supplemental authority that has come *after* this Court's original decision on this issue, steers the Court a different way. Rather than interpreting the question to be whether the tips and lightning speed fees were a *necessary* condition of the credit, this Court now understands the question to be whether these charges were "incident to the extension of credit." (Doc. 55-1, at 11). Instead of showing the charges were a *condition* of the credit extension, Plaintiffs need only allege a *connection* between them and the extension of credit. *Pfennig*, 541 U.S. at 240–41. As explained by the Northern District of California in the supplemental authority provided by Plaintiffs, "a charge need not be mandatory to be 'incident to the extension of credit' and thus constitute a 'finance charge' under TILA." (Doc. 55-1, at 11). This Court agrees that "[a]ll at is required is a connection between the imposition of the charge and the extension of credit." (Doc. 55-1, at 11). Here, Plaintiffs have undoubtedly alleged as much.[2] Plaintiffs

---

[2] In alleging their TILA claim, Plaintiffs also put forth the following:

75. The cash advance transactions conducted by Defendant over its EarnIn app is "credit," as defined by the Truth in Lending Act, 15 U.S.C. § 1602(f), in that Defendant grants its customers the right to defer payment of debt or to incur debt and defer its payment.

76. Therefore, because these are "credit" transactions, Defendant is a "creditor," Plaintiffs' and the Class's cash advances are "consumer credit transactions," and Plaintiffs, Defendant, and the members of the Class are "persons" within the meaning of TILA. 15 U.S.C. §§ 1602(e), (f), (g), (i).

77. Defendant fails to disclose any of the information required to be disclosed by TILA, including, but not limited to, the: "amount financed"; "finance charge"; if the cash advanced does not exceed $75 and the finance charge does not exceed $5, or if the cash advanced exceeds $75 and the finance charge does not exceed $7.50, the finance charge expressed as "annual percentage rate"; and "total of payments." 15 U.S.C. § 1638(a)(2), (3), (4), (5).

(Doc. 48, ¶¶ 75-77).

allege that "[t]he lightning speed fees that EarnIn charges to use a cash advance for its intended purpose, and the tips that EarnIn misleads or pressures its consumers to pay, are costly," and that EarnIn employs misleading tactics to compel users to pay tips. (Doc. 48, ¶¶ 35-39). Because Plaintiffs have alleged EarnIn makes it difficult to obtain the promised credit without paying the lightening fees and/or a tip, and because these charges are incident to the extension of credit Plaintiffs have met their burden under TILA. As "TILA is a remedial statute and should be construed liberally in favor of the consumer," the Court will allow Plaintiffs' TILA claim to proceed. *Ramadan v. Chase Manhattan Corp.,* 156 F.3d 499, 502 (3d Cir. 1998); *see also Cappuccio v. Prime Cap. Funding LLC*, 649 F.3d 180, 188 (3d Cir. 2011), *as amended* (Sept. 29, 2011). EarnIn's motion to dismiss the TILA claim, Count II of the second amended complaint, is **DENIED**. (Doc. 48, ¶¶ 74-79; Doc. 49).

IV. **CONCLUSION**

Based on the foregoing, EarnIn's motion to dismiss the second amended complaint (Doc. 48) is **DENIED**. (Doc. 49). An appropriate Order follows.

BY THE COURT:

Dated: August 28, 2025

*s/ Karoline Mehalchick*
**KAROLINE MEHALCHICK**
**United States District Judge**